Janet Marie **SEIFERT**, Appellant,

v.

David R. **SEIFERT**, et al., Respondents.

No. 49208.

Missouri Court of Appeals,
Eastern District,
Division Three.

Nov. 19, 1985.

Joan Marie Burger, St. Louis, for appellant.

Willard Dudley McCarter, Edward C. Vancil, Clayton, for respondents.

GARY M. GAERTNER, Judge.

Garnishor, Janet Seifert, appeals from the trial court's order denying her request for execution and garnishment and her petition for declaratory and injunctive relief. Garnishor sought to garnish a certificate of deposit owned by her ex-husband, David Seifert. Garnishor alleged that the certificate of deposit was located in David Seifert's account at the United Missouri Bank of St. Louis, which was named as garnishee. The American Druggists' Insurance Company filed a petition to intervene, claiming superior rights in the certificate of deposit by virtue of a collateral agreement executed by David Seifert.

On appeal, garnishor argues that the trial court erred in: (1) applying a ten-year statute of limitations to a lost cashier's check; (2) failing to properly balance the equities in considering garnishor's petition for declaratory and injunctive relief; (3) finding that the American Druggists' Insurance Company (intervenor) had a perfected security interest in the certificate of deposit; (4) finding that David Seifert had validly pledged the certificate of deposit to intervenor; and (5) making certain findings of fact that were either not supported by any evidence or were against the weight of the evidence. Finding no error on any of these points, we affirm.

The relevant facts are largely undisputed. Garnishor married David Seifert in 1968. David Seifert suffered an industrial accident in 1972, and in 1979 he received $146,137.70 as the net proceeds of a lawsuit arising from that accident. On January 7, 1980, the garnishee bank issued him a cashier's check in the amount of $130,000.00. One week later, on January 14, he presented the cashier's check to the garnishee and received $15,000.00 in cash and a $115,000.00 cashier's check. He put the $115,000.00 check in an envelope and placed the envelope in his hip pocket. He then went to a local tavern and had a few drinks. Later that day he discovered that he had lost the envelope and the cashier's check.

The following morning, January 15, David Seifert went to the garnishee bank and gave notice that he had lost the cashier's check. He signed an affidavit stating that the check had been lost, stolen or destroyed, that it was not in the possession of any person having a lawful right or claim to it, and that he had no knowledge of its whereabouts. Garnishee thereupon issued him a duplicate cashier's check to replace the lost check, and prepared a debit memo stating: "Affidavit on file, waiting for indemnity bond." That same day, David Seifert presented the duplicate check

to garnishee and received $5,000.00 in cash and a $110,000.00 cashier's check. Between January 15 and February 26, 1980, garnishee distributed an additional $10,-000.00 in cash to him.

On February 26, 1980, David Seifert purchased from garnishee a certificate of deposit in the amount of $100,000.00. On that same date, he purchased a "lost securities bond" from intervenor. The bond provided that intervenor would indemnify garnishee in the event that the lost cashier's check was ever presented for payment. David Seifert thereupon transferred physical possession of the certificate of deposit to intervenor, and signed a collateral agreement providing that intervenor could hold the certificate of deposit as collateral for the bond.

On September 28, 1982, the St. Louis County Circuit Court entered a decree dissolving the marriage of Janet and David Seifert. The court held that the $146,-137.70 that David Seifert received as a result of his industrial accident was marital property, including the $100,000.00 certificate of deposit. The court ordered that such property be divided equally between them.

Garnishor brought this action on February 7, 1983, to recover her one-half interest in the certificate of deposit, together with accrued interest. After a hearing, the trial court held that the certificate was not subject to garnishment, and thus denied the requested relief. Specifically, the trial court found that garnishee had properly required David Seifert to post security in the form of a lost securities bond after it issued him a duplicate cashier's check. The court further found that intervenor properly required David Seifert to post the certificate of deposit as collateral for the lost securities bond. The court found that the lost securities bond must continue in effect until the statute of limitations on the lost cashier's check has run, because until that time the garnishee would be subject to the risk of double liability if the lost cash-

ier's check was found and presented for payment. The court then applied a ten-year statute of limitations (§ 516.110(1), RSMo 1978) to the cashier's check, thereby extending the limitations period until January 17, 1990. The court thus held that the lost securities bond must remain in force until January 17, 1990, and that the certificate of deposit—which presently serves as security for the bond—is not subject to garnishment because intervenor's security interest gives it superior rights in the certificate of deposit. Garnishor appeals from that decision.

Preliminarily, we note that this case was tried without a jury, and our scope of review is therefore controlled by Rule 73.01. We must sustain the trial court's order "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976).

In her first allegation of error, garnishor argues that the trial court erred in applying a ten-year statute of limitations to the lost cashier's check. Although the court's order did not explicitly set forth the applicable limitations period, the parties agree that the court applied § 516.110(1), RSMo 1978. That section provides that "[a]n action upon any writing ... for the payment of money" shall be commenced within ten years.

Garnishor contends that the "reasonable time" standard set forth in the Missouri Uniform Commercial Code (ch. 400, RSMo 1978) is the appropriate limitations period for a cashier's check. Section 400.3–503, RSMo 1978, provides that a party to a demand instrument may not be charged unless the instrument has been presented for acceptance within a reasonable time.[1] Garnishor cites several early cases predating the Uniform Commercial Code in which courts applied these presentment standards as limitations periods for cashier's checks and other negotiable instruments. *See,*

1. That section further provides that a reasonable time is presumed to be thirty days with respect to the liability of a drawer, and seven days with respect to an indorser's liability.

*e.g., Smalley v. Queen City Bank,* 94 S.W.2d 954 (Mo.App.1936). Similarly, garnishor notes that a person presenting a demand note instrument an unreasonable length of time after its issuance cannot be a holder in due course.[2] *See, e.g., Franklin Bank v. St. Louis Car Co.,* 321 Mo. 199, 9 S.W.2d 901 (1928). Garnishor contends that a reasonable time has elapsed since garnishee issued the lost cashier's check, and thus the check is no longer properly payable.

■■■ Garnishor's argument fails, however, because the reasonable time provisions on which she relies have no relation to cashier's checks. A cashier's check is a unique instrument, differing in several important respects from an ordinary check. An ordinary check is a three-party instrument, involving the bank (as drawee), its customer (as drawer) and the payee; a cashier's check, on the other hand, is a two-party instrument, involving only the bank (as both drawer and drawee) and the payee. Although the Uniform Commercial Code does not contain any specific provisions relating to cashier's checks,[3] the Missouri Supreme Court has recognized the significance of the above distinction:

A cashier's check, unlike an ordinary check, is a check drawn by a bank on itself and is accepted by the mere act of its issuance.... Thus, when issued, it becomes the primary obligation of the bank (rather than the purchaser) to pay it from its own assets upon demand, and the purchaser has no authority to countermand a cashier's check because of fraud allegedly practiced on the purchaser by the payee.

*State ex rel. Chan Siew Lai v. Powell,* 536 S.W.2d 14, 16 (Mo. banc 1976). Given that a cashier's check is "accepted by the mere act of its issuance," presentment for acceptance is not necessary in order to charge the issuing bank. *Cf. Burns v. Weber,* 399 S.W.2d 446, 448 (Mo.App.1966); § 400.3–501, comment 4, V.A.M.S. The reasonable time provisions which garnishor argues should be applied in the instant case all relate to the time during which presentment for acceptance must be accomplished. Those provisions are, therefore, inapplicable to the instant case.

Garnishor's argument for the application of a reasonable time limitations period is also inconsistent with the purpose of a cashier's check.

The nature and usage of cashier's checks in the commercial world is such that public policy does not favor a rule that would permit stopping payment of them.... 'A cashier's check circulates in the commercial world as the equivalent of cash. * * * People accept a cashier's check as a substitute for cash because the bank stands behind it, rather than an individual.'

*Chan Siew Lai, supra* at 16, *quoting National Newark & Essex Bank v. Giordano,* 111 N.J.Super. 347, 268 A.2d 327 (1970). Allowing a bank to forsake its obligation on a cashier's check after a reasonable time has elapsed (which might be as little as thirty days) would diminish the cash-like quality of cashier's checks and defeat the purpose for which they were created.[4]

■■■ Although public policy disfavors stopping payment on a cashier's check, this does not mean that such instruments should remain forever negotiable. Situa-

**2.** Section 400.3–302(1)(c), RSMo 1978, provides that a holder in due course must take the instrument "without notice that it is overdue...." Such notice exists if the purchaser "has reason to know ... that he is taking a demand instrument ... more than a reasonable length of time after its issue." Section 400.3–304(3), RSMo 1978.

**3.** Indeed, Article 3 of the Code, which governs negotiable instruments, does not even mention cashier's checks. The only mention of cashier's

checks appears in a single section of Article 4, which governs bank deposits and collections. *See* § 400.4–211, RSMO 1978.

**4.** Garnishor argues that this consideration is inapposite in the instant case because no evidence has been presented showing that the lost cashier's check has been part of any commercial transaction. Garnishor has not conclusively proved, however, that David Seifert did not negotiate the check to some purchaser in exchange for commercial goods.

tions such as the one before us indicate that there must be some point after which an action on a cashier's check can no longer be maintained. The trial court solved this problem by applying the ten-year limitations period on "any writing ... for the payment of money...." Section 516.-110(1), RSMo 1978. This ten-year period operates to preserve the cash-like quality of cashier's checks, while at the same time foreclosing potential litigation after a significant length of time has passed. We thus agree with the trial court's ruling on this issue.

■ A New Jersey appellate court faced similar issues in *Santos v. First National State Bank of New Jersey*, 186 N.J.Super. 52, 451 A.2d 401 (1982). In that case, plaintiff lost a cashier's check in the mail only a few days after its issuance. Over four years later, plaintiff's bank still refused to issue him a duplicate check unless he posted an indemnification bond or other security. Plaintiff sued to compel the bank to issue a duplicate check. The court recognized that in most instances cashier's checks are negotiated promptly: "One would have to be suspicious of any holder who presented this cashier's check for $15,-514.46 more than four years late yet claimed he had taken it in timely fashion after it was issued." *Id.* 451 A.2d at 412. The court nevertheless rejected plaintiff's reliance upon the Uniform Commercial Code's reasonable time provisions, citing the unique nature of cashier's checks. *Id.* The court then applied New Jersey's six-year limitations period for contract actions. The court thus held that the bank could continue to require security until the six-year period had run. The *Santos* decision thus supports our holding that garnishee may continue to require security until the limitations period on the lost cashier's check has run.

■ Garnishor also argues that applying a ten-year limitations period is erroneous because, according to David Seifert's un-

contradicted testimony, he did not indorse the cashier's check before losing it. Lacking his indorsement, no one can be a holder of the check, much less a holder in due course entitled to payment. *See generally* Rosenthal, *Negotiability—Who Needs It?*, 71 Colum.L.Rev. 375, 379 (1971); *Santos, supra*, 451 A.2d at 411. The evidence presented to the trial court, however, does not conclusively prove that David Seifert did not indorse the check. Although David Seifert testified that he did not indorse the check, the trial court had discretion to disbelieve his testimony. The court apparently did disbelieve him, because it expressly refused to make any specific findings as to whether or not he indorsed the check before losing it.

■ In *Santos, supra*, the court faced a similar situation. There was no evidence in the record establishing whether plaintiff had indorsed the lost cashier's check before putting it in the mail. Plaintiff's attorney asserted, however, that plaintiff would deny that he indorsed the check. The court nevertheless required plaintiff to post security before receiving a duplicate check:

> Although it is possible, it is highly improbable that the check in this case will reappear at this late date, much less in the hands of one who qualifies as a holder in due course. Nevertheless, to require payment now without security for indemnification would expose defendant to a risk of loss through no fault of its own.
>
> . . . .
>
> ... Suffice it to say that even if plaintiff testified that he did not personally sign the instrument, the bank should not be put to the risk that a holder may assert that plaintiff authorized someone else to make the indorsement.

*Id.* at 413. We concur in this analysis, and hold that the trial court in the instant case properly applied the ten-year limitations period.[5]

<hr/>

5. Garnishor makes much of the fact that the garnishee bank disbursed $15,000.00 in cash to David Seifert between January 15, when he re-

ceived the duplicate check, and February 26, when he obtained the lost securities bond. Garnishor argues these disbursements indicate that

In her second allegation of error, garnishor argues that the trial court erred in denying her petition for equitable relief in the form of a declaratory judgment and an injunction. Garnishor asked the court to declare that garnishee bank had no legal or equitable right to continue to hold the certificate of deposit, and to order garnishee to pay the amount prayed for into the circuit court. At trial, the court denied garnishor's offer of proof regarding her financial situation and the economic needs of her four minor children. Garnishor contends that such evidence was relevant to her claim for equitable relief, and that the court failed to properly balance the equities pertaining to garnishor's and garnishee's respective claims to the certificate of deposit.

▮ "It is well established that equity follows the law, and that a court of equity just as a court of law is bound by established rules and precedents." *State ex rel. State Highway Commission v. Morganstein*, 649 S.W.2d 485, 487 (Mo.App.1983). A court of equity may not, therefore, act merely upon its own conceptions of what may be right or wrong in a particular case. *Hall v. Hall*, 506 S.W.2d 42, 45 (Mo.App. 1974). Moreover, no maxim of equity may be invoked to destroy an existing legal right, nor may equity purport to establish a right that does not exist. *Bates v. Mueller*, 413 S.W.2d 853, 855 (Mo.App.1967).

▮ In the case before us, garnishee and intervenor have legal rights in the certificate of deposit at issue. As discussed more fully below, these rights are superior to any right asserted by garnishor. Equity cannot, therefore, afford relief to garnishor. Accordingly, we hold that the trial court properly rejected her offer of proof and denied her request for declaratory and injunctive relief.

In her third allegation of error, garnishor argues the trial court erred in holding that intervenor had a perfected security interest in the certificate of deposit when garnishor filed this action on March 19, 1983. Garnishee issued the original certificate of deposit, number 0892, on February 26, 1980. On that date, garnishee executed a collateral agreement pledging the certificate to intervenor. That certificate matured after one year, whereupon David Seifert obtained a new certificate, number 1380. On March 9, 1981, he pledged certificate 1380 to intervenor as collateral for the lost securities bond and took the previous certificate, number 0892, back from intervenor. One year later, on February 25, 1982, he obtained a new certificate, number 1918, and pledged this to intervenor, taking certificate 1380 back from intervenor. Finally, on March 23, 1983, David Seifert obtained another new certificate, number 2486, and pledged this to intervenor, taking the previous certificate back. The trial court found that intervenor had continuous possession of each of these four certificates of deposits, except for the few minutes necessary to exchange the certificates and execute new collateral agreements. Accordingly, the trial court held that intervenor had a perfected security interest in certificate number 1918 when garnishor filed this action on March 19, 1983, and that such security interest remained perfected when number 1918 was exchanged for number 2486 four days later.

Garnishor argues that intervenor's security interest in certificate number 2486 was not perfected on March 19, 1983, because that certificate actually "came into existence" on February 25, 1983. Garnishor contends certificate 2486 was created on February 25 because that date appears on the face of the certificate. Garnishor states that certificate 2486 "replaced" certificate 1918 on February 25, but that a new collateral agreement pertaining to certificate 2486 was not executed until March 23. Garnishor thus concludes that intervenor was not a secured party on March

garnishee has never feared any exposure to double liability on the lost cashier's check. We cannot speculate about why garnishee made such disbursements. Whatever the reason, however, such disbursements do not diminish garnishee's legal right to require security upon issuing a duplicate cashier's check.

19, when this action was filed, because on that date it held only certificate 1918, which had already matured and been superseded by certificate 2486.

 Garnishor's argument fails because the date on which a certificate of deposit matures does not affect ownership thereof. After a certificate matures the issuing bank no longer guarantees a particular interest rate, but the certificate can nevertheless be presented for payment after the maturity date. Hence, even though certificate 1918 matured on or about February 25, 1983, that certificate remained payable until March 23, 1983, when it was exchanged for certificate 2486. Intervenor thus remained fully secured throughout that period. Moreover, the mere fact that interest began accruing on certificate 2486 on February 25 does not mean that it superseded or "replaced" certificate 1918 on that date. Accordingly, we affirm the trial court's decision that intervenor had a valid security interest in the certificate of deposit when garnishor brought this action.

 In her fourth allegation of error, garnishor argues the trial court erred in finding that garnishor did not have a prior claim to the certificate of deposit as marital property. Garnishor contends that if the certificate of deposit was marital property—as the divorce court determined—then he could not have validly pledged the certificate to intervenor. Garnishor thus concludes that her interest in the certificate overrides any interest asserted by intervenor.

Although we agree that the certificate of deposit was marital property, garnishor cites no authority—and we have found none—indicating that such property cannot be validly pledged by one marital partner. In the case before us, David Seifert assigned the certificate of deposit as collateral for the lost securities bond that garnishee required him to obtain after it issued the duplicate cashier's check. Given that the assignment was valid, intervenor's rights in the certificate are superior to all other asserted claims. *See Southwestern Bell Telephone Co. v. Crown Insurance Co.*, 416 S.W.2d 705 (Mo.App.1967). The trial court thus properly held that garnishor's marital rights did not override intervenor's security interest, and that garnishee retained no garnishable interest in the certificate subsequent to the assignment to intervenor.

In her final allegation of error, garnishor argues that three findings of fact made by the trial court were either not supported by any evidence or were against the weight of the evidence. Garnishor contends that these findings were critical to the court's decision.

 The first finding challenged by garnishor provides that the $15,000.00 distributed to David Seifert between issuance of the duplicate cashier's check and procurement of the lost securities bond was distributed "only on the condition that [garnishor] would post a Lost Securities Bond indemnifying Garnishee from any loss occasioned by future presentment of the lost cashier's check." We hold that this finding was not against the weight of the evidence. When garnishee issued the duplicate check it prepared a debit memo stating that it was "waiting for [an] indemnity bond." Moreover, an officer of the garnishee bank testified that the duplicate check was placed in a suspense account pending outcome of the indemnity bond application. This evidence supports the challenged finding.

The next finding challenged by garnishor provides:

> The Court does find that as of the date that Garnishee, United Missouri Bank decided to create a Certificate of Deposit in Mr. Seifert's name, Mr. Seifert ha[d] not given the bank sufficient reason to believe that he had not endorsed the check before he lost it.

As discussed above, David Seifert's claim that he did not indorse the check before losing it is not conclusive proof of that fact. Hence, the challenged finding was not against the weight of the evidence.

The last finding challenged by garnishor provides:

**158**

The Court makes no specific findings as to whether Mr. Seifert endorsed the check before he lost it and the Court makes no specific findings regarding whether the check was subsequently destroyed.

None of the evidence presented to the trial court conclusively proved whether David Seifert indorsed the check or whether it was destroyed. The trial court was entitled to disbelieve David Seifert's testimony regarding his handling of the check if it so chose. Accordingly, the challenged finding was not against the weight of the evidence.

Judgment affirmed.

KAROHL, P.J., and SIMON, J., concur.